Filed 12/4/14  P. v. Frank CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

CHRISTOPHER JAMES FRANK,

    Defendant and Appellant.

E059627

(Super.Ct.No. FVI1300674)

**OPINION**

APPEAL from the Superior Court of San Bernardino County.  John B. Gibson and Jules E. Fleuret, Judges.  Affirmed.

Christopher James Frank, in pro. per.; and Lizabeth Weis, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

## I

## STATEMENT OF THE CASE

An information charged defendant and appellant Christopher James Frank with multiple offenses stemming from an incident on March 3, 2013, at his house, in which his

1

girlfriend (the victim) was assaulted, as follows: (1) kidnapping under Penal Code[1] section 207, subdivision (a) (count 1); (2) criminal threats under section 422 (count 2); (3) possession of a firearm by a felon under section 29800, subdivision (a) (count 3); (4) possession of ammunition by a felon under section 30305, subdivision (a)(1) (count 4); (5) assault with a firearm under section 245, subdivision (a)(2) (count 5), with the allegations that defendant personally used a firearm under section 12022.5, subdivisions (a) and (d), and inflicted great bodily injury under section 12022.7, subdivision (a); (6) torture under section 206 (count 6); (7) sexual penetration by a foreign object under section 289, subdivision (a)(1)(A) (count 7); (8) corporal injury to a cohabitant under section 273.5, subdivision (a) (count 8), with the allegations that defendant personally used a firearm under sections 1203.06, subdivision (a)(1), 12022.5, subdivision (a), and inflicted great bodily injury under section 12022.7, subdivision (e); and (9) false imprisonment by violence under section 236 (count 9). The information also alleged that defendant was previously convicted of a violation of section 245, subdivision (a)(1); and a strike prior under sections 1170.12, subdivisions (a) through (d), and 667, subdivisions (b) through (i).

Defendant admitted his 2003 prior felony conviction for assault with a deadly weapon.

The jury found defendant not guilty of kidnapping (count 1) and sexual penetration by a foreign object (count 7). The jury found defendant guilty of criminal

---

[1] All statutory references are to the Penal Code unless otherwise specified.

threats (count 2); possession of a firearm by a felon (count 3); possession of ammunition by a felon (count 4); assault with a firearm (count 5); torture (count 6); corporal injury to a cohabitant (count 8); and false imprisonment by violence (count 9). Regarding the special allegations, the jury found that (1) defendant personally used a firearm during the commission of the assault, but that he did not inflict great bodily injury; and (2) defendant personally used a firearm and inflicted great bodily injury in the commission of corporal injury to a cohabitant.

The court sentenced defendant to prison under section 667, subdivisions (b) through (i), for a total term of 24 years to life, as follows: 14 years to life for torture; upper term of six years for the principal determinate count, criminal threats, to be served consecutively; and one year, four months each for possession of a firearm, possession of ammunition, and false imprisonment, to be served consecutively. The terms for count 5, assault with a firearm, and count 8, corporal injury to a cohabitant, were stayed under section 654.

Defendant filed a timely notice of appeal. Thereafter, defendant filed numerous motions on appeal in pro. per. His motions to augment the record have been granted but his motions for new appellate counsel have been denied.

## II

### STATEMENT OF FACTS

In the early evening on March 3, 2013, John Mahany was home on Mariner Street. Defendant, his neighbor, came to Mahany's door. Their houses are on a lake, with access to a dock in the backyard. Defendant appeared nervous, anxious and acted strangely, as

3

he explained some problems at his house. Defendant was concerned that there was someone talking on a cell phone in the attic of his house, and that a couple of people had come in through the roof and trashed his house. When he chased them out, they ran down the street in opposite directions. Defendant asked to borrow Mahany's phone. Defendant did not mention that his girlfriend was at the house. While they were talking, defendant stopped a car on the street and asked the driver to open the trunk; the driver obliged and then drove on after defendant saw there was nothing there. After defendant left, Mahany called defendant's grandmother, who owned the house, to tell her about defendant's strange behavior.

Michael Claunch was throwing a ball for his dog in front of his house, across the cul-de-sac from defendant's house, around 6:30 p.m. on March 3, 2013. The ball rolled into defendant's open garage; Claunch went to retrieve it. He saw a black Cadillac in the garage as he approached and called out, "Hello," to announce himself. Defendant came running out and asked Claunch what was going on. After Claunch explained he was retrieving his ball, defendant told Claunch that defendant's house had been broken into. When Claunch asked if defendant had called the sheriff's department, defendant said he called but they had not shown up. When Claunch suggested that defendant should call again, he confessed that he had not called law enforcement. Defendant then "went off" telling Claunch that people had been in his attic but now they were somewhere on the loose. Claunch told defendant he really needed to call the sheriff's department, and then defendant wanted Claunch to hear a recording on defendant's cell phone. Defendant was scratching his arms and seemed very jittery. Claunch figured defendant might be on

4

something.  Claunch started backing down to the street, but defendant followed him and continued to talk.  Claunch repeated that defendant should call the police and defendant responded that he had one of them tied up in the trunk.  Claunch asked, "'You have somebody tied up in the trunk of your car?'"  Defendant responded, "'No, I have them tied to a trunk in the house.'"  Claunch said defendant needed to call the police because he could not just tie people up in his house.  When defendant told Claunch he was going to handle it himself, Claunch said he would call the police.  Defendant did not tell Claunch anything about his girlfriend or a woman.

Thereafter, Claunch went to ask Mahany if he knew what was going on at defendant's house.  After talking about their encounters with defendant, they called 911.

About 6:45 p.m. on March 3, 2013, in response to the call made by defendant's neighbors that defendant had someone duct taped inside his house, Deputies Kirkendall and Kraft both arrived at defendant's house.  Upon arrival, they heard defendant yelling inside the house.  Through the glass panel in the front door, Kraft saw defendant in the rear of the house.  The gate was locked so Deputy Kraft jumped the white fence and knocked on the door, announcing it was the sheriff's department.  Defendant and his mother, Kimberly Frank, approached in the hallway.  At that point, the garage door opened and defendant's mother came out.  She told Deputy Kirkendall that her son was inside; he was yelling and upset.  A black Cadillac was parked in the garage.

In the living room, Deputy Kirkendall found defendant's mother, defendant's grandmother, and defendant sitting on the couch with defendant's arm around the victim.  The victim had extensive swelling and bruising to her face.  As Deputy Kirkendall asked

5

the victim what had happened and who was responsible for her injuries, the victim would turn toward defendant and then answer. Defendant also cut off the victim and answered some of the questions on her behalf. This struck the deputy as unusual and made him suspicious.

When asked who caused her injuries, the victim stated it was Eric Norris, defendant's friend. She, however, did not know why Norris had injured her. She said that Norris showed up and told her he was there to pick up his PlayStation, a television, and a bong; he offered her $200 to let him in. When Norris got inside, he asked where defendant was and became upset. When the victim said that defendant was on a walk, Norris slammed her against the corner of the hallway, punched her about 30 times, and then left without taking anything. The victim told Deputy Kirkendall about the injuries to her face and her knee, but nothing else.

After the victim talked to the deputies the first time, they went around looking for evidence. Deputy Kirkendall found the master bedroom trashed with things thrown around. There was a roll of duct tape and a piece of duct tape with hair on the floor by the door. A blood-stained suitcase was in the master bathroom, and blood, clothes (a brown shirt and black shorts), and towels were in the shower. There were what appeared to be wiped drops of blood across the floor in the hallway leading to the guest bathroom. In the guest bathroom, another set of soaking wet clothes were on the floor of the shower; a bloody towel was on the counter.

Deputy Kraft found two unused .12-gauge shotgun rounds and an unused 7.62 rifle round on the desk in the garage. A few seconds later, defendant came into the garage.

6

The deputy asked defendant if there were any guns or knives in the house. Defendant stated that there were no guns, but several knives were in his car, and he had a machete above his headboard. Defendant said that the ammunition Deputy Kraft found was left over from skeet shooting with some friends the week prior. Defendant then returned to the house. Deputy Kraft continued to look in the garage and saw the butt of a black .12-gauge shotgun propping up the lid to a trash can. Inside the trash can, there was a duffle bag with a wooden SKS assault rifle, which used the 7.62 rifle rounds from the desk. The deputy also found a box on the floor in the master bedroom that contained two additional unused .12-gauge shotgun shells, one more unused 7.62 rifle round, and a college ID card belonging to defendant.

Deputy Kraft returned to the living room and asked defendant why he lied about having no guns in the house. Initially, defendant denied having said that. He then stated that the rifle belonged to Norris and the shotgun belonged to the victim. The victim agreed that the shotgun was hers. Defendant told Deputy Kraft that he was not allowed to have guns because of his past, and he speculated that Norris must have put the rifle in the trash can after he assaulted the victim. The deputy ran the serial numbers on the weapons; they were not registered to anyone.

Neither deputy believed that the evidence supported the victim's version of events because she had stated that Norris had hit her in the living room. However, there was no blood in the living room. Deputy Kirkendall handcuffed defendant and put him in the patrol car in order to question the victim without defendant present.

7

In the living room were the victim, defendant's mother and defendant's grandmother; the deputies told the victim that her story did not match the evidence and that she needed to tell them the truth. The victim said that she couldn't say anything because, "'He'll kill me.'" Deputy Kirkendall asked who she was talking about. The victim started crying and finally stated, "'Christopher'" (defendant's name). She repeated that she was afraid defendant would kill her and her family if she said anything. The victim then started to repeat the story about Norris, but Deputy Kirkendall told her that he felt she was lying and she could be arrested for delaying and resisting a peace officer. The victim kept saying, "'I can't. He'll kill me.'" At this point, Deputy Kirkendall handcuffed the victim and told her that he was taking her to the station. She said she didn't want to go to jail. The deputy told her that that was where she was going. The victim then stated she would tell him everything if he took the cuffs off.

Deputy Kirkendall removed the cuffs. The victim cried as she told him that defendant came home and started accusing her of cheating on him with Norris. He hit her five or six times in the face, dragged her down the hallway by her hair twice, duct taped her mouth, put her in the trunk of the car, and hit her with the black shotgun. The victim also stated that the shotgun and rifle belonged to defendant. The deputies believed that the victim was telling the truth.

Deputy Kirkendall went out to the patrol car, told defendant he was being arrested, and read him his rights under *Miranda v. Arizona* (1966) 384 U.S. 26. Defendant told Deputy Kirkendall to find his cell phone if he wanted to know what happened because Norris had called and asked to cook methamphetamine in defendant's attic. Defendant

8

believed that Norris showed up and beat the victim after defendant turned him down. The deputy noted that defendant's hands had small cuts and some bruising. Defendant stated that they were from working on a paddle boat. Defendant did not tell the deputy that his home had been burglarized.

At defendant's insistence, Deputy Kraft inspected the attic but found nothing consistent with cooking methamphetamine. Deputy Kirkendall went to Norris's house three weeks later and spoke to Norris's father; he stated that Norris refused to talk. The deputies never questioned Norris. Norris was checked for warrants but the deputy could not recall the results. Deputy Kirkendall stated that he would not be surprised if Norris had outstanding warrants.

The victim's face was too swollen for Deputy Kirkendall to tell if she was under the influence of any substance. The deputy was present for a meeting with the prosecutor and the victim before the preliminary examination. He did not remember the victim telling him whether she used drugs prior to the incident.

At trial, the victim testified that she began to date defendant after they met in November of 2012. Even though she never officially moved in, she eventually slept and ate at the lake house. Her things were there. She did not have a key to the house or a control for the garage door. She never left the house without defendant. When her mother would pick her up, defendant would let her out through the garage door. Her mother would drop her off in the front yard when she returned. The victim and defendant broke up at one point, but he never asked her to move out. She was still living there and in a sexual relationship with him. She did not recall whether defendant had broken up

with her on March 3, the day of the incident. The victim admitted that she used methamphetamine on the day before the incident, and had received immunity from the prosecution for that conduct.

The victim testified that she was home alone around 1:30 p.m. to 2:00 p.m. on March 3, wearing defendant's black sweat pants and his brown shirt; she was sleeping in the bed in the master bedroom. Defendant came home and woke the victim up. He asked her who she was talking to out the window. Defendant was upset because he suspected that the victim was cheating on him with Norris. He wanted to know where she was hiding "Sancho," which she understood to mean "secret lover." She told him that she was not cheating on him. Defendant stated that she was lying and that made him angrier. The victim remembered what happened, but she was fuzzy on the chronological order of events.

Defendant punched the victim in the face and stomach more times than she could count. Defendant grabbed her by the ankles or legs and pulled her out of bed. She ended up on the floor, but she did not recall whether this was before or after defendant punched her. Defendant kept repeating that the victim was lying. He stated that he would stop if she told him the truth. She repeated that she was not cheating on him. Although the victim asked defendant to stop, he did not.

Defendant grabbed a plastic shoehorn that was on the couch and hit her thighs with it repeatedly. She did not remember where she was but she did not believe she was wearing pants at this time.

10

Defendant dragged the victim up and down the hall by her hair. She believed she was wearing clothes at the time because she did not have burns from being dragged. She did not try to fight against him. She, however, asked defendant to stop.

The victim did not recall where she was, but at some point, defendant left her alone. She did not know what he was doing or where he was going. She did not try to leave because she thought it would have made defendant angrier. Defendant came back with a black shotgun, which was kept in a few places in the house. The victim testified that she was naked when defendant shoved the shotgun in her vagina. Defendant also hit her with the tip of the shotgun on her foot, hand, arm, and stomach. He hit her hip with the butt of the gun.

The victim knew defendant also had a brown rifle and that he had bullets for the guns. She had not seen defendant use either of the guns but had seen him load bullets in them. She also had loaded bullets into the clips and defendant had shown her how to check if the safety was on. Defendant told her the guns were his but that he was not allowed to own guns.

At some point, defendant forced the victim to take a cold shower in her clothes. She removed the wet clothes in the shower and did not put more clothes on. She identified a white T-shirt and a towel that she used; both were stained with her blood. Defendant wrapped the T-shirt around the victim's neck and strangled her with it until she almost passed out.

When the victim did not have any clothing on, defendant took her by the arm into the garage. He pulled down the ladder to the attic and told her to go up there to look for

11

Sancho. She went into the garage without resisting because any resistance would have made defendant angrier. Defendant told her to keep looking for Sancho; he then closed the attic door. She did not try to climb down from the attic fearing that defendant would get angry. She sat in the attic. About 15 to 20 minutes later, defendant opened the door and told the victim to come down.

Defendant also grabbed the victim by the arm and made her get into the trunk of his black Cadillac. She did not believe she was wearing clothes at the time. Defendant closed the trunk and left her in there. The victim actually felt a little safer because she was away from defendant. After 15 to 20 minutes, defendant came back, opened the trunk, and told her to get out. At this point, defendant got angry when he stepped in some dog feces on the floor; he wiped it off his foot and put it on the victim's face.

Defendant bent and broke the victim's right middle finger. He also put duct tape across her mouth. She identified a piece of duct tape that defendant had used; it had strands of her hair attached. Defendant also bit the victim's nose and cheek, leaving scars shaped like teeth marks. Her nose was broken and she had stitches to close a cut on her eyebrow. Defendant also stuck his fingers in the victim's eyes, which caused hemorrhaging in both eyes.

The victim did not try to escape. It was not possible to escape because the front door was deadbolted with a key possessed only by defendant. Defendant sometimes left the key on a coat rack in the hallway; sometimes it was in a safe. The victim did not remember if she had looked for it to escape. Even if she had, there was not enough time to unlock the front door and then the gate without defendant hearing her or the keys. She

12

did not leave out of the sliding glass back door because it leads to the lake. There was a white fence the victim could have jumped over and into the neighbor's yard, as well as a pathway from the dock of defendant's house to the neighbor's dock. She, however, did not try to escape because her injuries prevented her from moving quickly.

The victim did not try to call the police. There was no landline and defendant had the victim's cell phone. Defendant could see that the victim needed medical help and told her he would call the police if she would tell them that Norris was the one who hurt her. Defendant told her to tell the police that Norris came over to pick up his PlayStation, TV and a bong, then got angry and hit the victim when she would not tell him where defendant was.

The victim took defendant seriously when he stated that she would "end up dead" if she told anyone that he was the person who hurt her. He knew where her family lived. Also, she feared that his friends would come after her if she was responsible for putting him in jail.

Before the police arrived, the victim believed that she took another shower, cleaned up the dog feces from her face, and got dressed. Then she and defendant practiced the story the victim was supposed to tell the police.

The victim estimated that about six to seven hours after the events started, defendant's mother, grandmother, and the two police officers arrived around the same time.

The victim could not recall if the police questioned her when they first arrived, with defendant present. The victim remembered sitting on the couch in the living room,

13

and that defendant may have already been arrested and placed in the police car when she talked to the police. She told them the story about Norris that defendant had made up and she had practiced. She stated that the police did not believe her. They asked her the same questions over and over, but she repeatedly told them the same story because she was afraid of defendant's threats. The victim was afraid that she would be charged with a felony for lying to the police. This was when she finally told them the truth.

The victim did not tell the police that defendant put the shotgun in her vagina at the time because she was uncomfortable telling the male officers. Moreover, at the hospital she denied she had been raped because she thought rape meant forced sex with a person. Moreover, she was embarrassed to tell anyone at the hospital because her family was there and she had a male doctor. The first time she mentioned the vaginal assault and dog feces incident was in an email to the female deputy district attorney.

The victim was treated in the emergency room and released. She returned to the hospital the next day, dehydrated, nauseous, and in pain. She was admitted for four days. The victim was diagnosed with a concussion. Dr. Munir, the treating physician, described her as suffering major trauma caused by a significant amount of force, such as a car accident. She had nasal fractures and her face was very swollen. She also had stitches to suture cuts on her eyebrow and left knee. Dr. Munir identified what he believed to be bite marks on the victim's left cheek. She had staples to close a laceration on her scalp. The victim's abdominal area had marks that looked like someone had pushed a gun hard into her stomach. The victim told the doctor that she was beaten up by her boyfriend. The doctor stated that the victim's injuries were consistent with what the

14

victim had told him. Dr. Munir forgot to ask her whether she had been sexually assaulted, but there was nothing in the hospital record that indicated sexual assault. Dr. Munir suspected that the victim had a history of drug abuse; her family members discussed that with the nurses.

The victim was treated by a psychologist and psychiatrist for PTSD and depression after this incident with defendant.

In the middle of trial, Deputy Kirkendall discovered that he had recorded a portion of his contacts with defendant and the victim on a recorder attached to his belt. He routinely turned the belt recorder on only when he was talking to or escorting individuals. If he kept the recorder on at all times, the memory card would fill up with irrelevant noise. The recording was about 20 minutes long, beginning with the victim's statements about Norris; the deputy walking defendant to the patrol unit; a portion with defendant's mother; and a portion with the two deputies. The recording did not include Deputy Kirkendall advising defendant of his *Miranda* rights. Defendant is heard asking if he is under arrest. Deputy Kirkendall responded that defendant was not and that he would *Mirandize* defendant if he were under arrest. The recorder is then turned off. The deputy turned it off because he was walking back to the house. The deputy did not turn the recorder back on when he went back to the patrol car to tell defendant he was under arrest. He did, however, document in his report the time that he advised defendant of his rights.

Defendant objected to the admission of statements made by him; he argued that he was not advised of his *Miranda* rights and that the prosecution had failed to meet the

15

burden that defendant knowingly, voluntarily, and intelligently waived his rights. The court ruled that the uncontradicted evidence showed that defendant was advised of his rights.

The next morning, after defense counsel had the opportunity to listen to the belt recording, he argued that the recording contained previously undisclosed exculpatory statements made by both defendant and the victim. The victim is heard telling Deputy Kirkendall that she let Norris into the house and he harmed the victim. The victim was asked about the shotgun and denied it was hers. Defense counsel argued that Deputy Kirkendall was then heard asking Deputy Kraft if he got a serial number off the shotgun and if he ran it. The gun came back registered to the victim. Then they confronted her with that and she admitted it was her gun.

Moreover, in the recording, defendant is heard telling Deputy Kirkendall that $600 and medical marijuana were stolen from his safe; this was never disclosed before. It corroborated defendant's statement to his attorney that the victim had opened the safe for Norris and he stole property from the safe.

Furthermore, in response to Deputy Kirkendall's questions about injuries to his hands, defendant is heard saying he hurt himself fixing the paddle boat.

In light of this evidence, defense counsel renewed his motion for a mistrial. He argued that defendant was ambushed by the late discovery of exculpatory evidence. The prosecution replied that the deputy did not indicate to her or in the police report that there was a belt recording, and that she was unaware it existed until the deputy mentioned it in court. After discussion, it appears that the trial court denied defendant's motion for a

16

mistrial, but allowed defense counsel to play the belt recording for the jury without a transcript.

## III

## ANALYSIS

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738, setting forth a statement of the case, a summary of the facts and potential arguable issues, and requesting this court to undertake a review of the entire record.

We offered defendant an opportunity to file a personal supplemental brief, and he has done so. On July 14, 2014, defendant filed a 56-page handwritten supplemental brief with exhibits. Thereafter, on October 14, 2014, defendant filed a 23-page handwritten second supplemental brief. In his briefs, defendant essentially argues ineffective assistance of counsel (IAC); prosecutorial misconduct; that his sentencing under the "Three Strikes" law violated his due process rights; and a violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436.

We first address defendant's IAC claim. In order to establish a claim of IAC, defendant must demonstrate, "(1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. [Citations.] A 'reasonable probability' is one that is enough to

17

undermine confidence in the outcome. [Citations.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541, citing, among other cases, *Strickland v. Washington* (1984) 466 U.S. 668; accord, *People v. Boyette* (2002) 29 Cal.4th 381, 430.) Hence, an IAC claim has two components: deficient performance and prejudice. (*Strickland*, at pp. 687-688, 693-694; *People v. Williams* (1997) 16 Cal.4th 153, 214-215; *People v. Davis* (1995) 10 Cal.4th 463, 503; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.) If defendant fails to establish either component, his claim fails.

In this case, defendant appears to be claiming that the performance of both his trial counsel and appellate counsel was deficient. As for trial counsel, defendant contends that his counsel failed to investigate his case. Defendant, however, fails to specifically provide what investigation should have occurred, and how he would have benefitted from such investigation. Defendant also claims IAC because counsel failed to file a motion under section 995, "failed to provide the jury with instructions pertaining to victim's intoxication and/or any lesser included offenses[,]" and failed "to provide the jury with instructions pertaining to defendant's intoxication and/or any lesser included offenses." Moreover, defendant seems to be arguing IAC because trial counsel did not file a *Pitchess* motion prior to trial. Furthermore, defendant appears to be arguing IAC because of counsel's alleged failure to interview and subpoena witnesses; failure to argue double jeopardy; ineffective closing argument; failure to request proper jury instructions; failure to impeach witnesses; failure to present good character evidence; failure to investigate defendant's mental state; failure to advise defendant properly prior to defendant

18

admitting his prior convictions; failure to file a motion for new trial; failure to inform him of his right to testify on his own behalf.

We have reviewed the record and find that defense counsel actively and conscientiously represented defendant throughout the trial court proceedings. Counsel examined and cross-examined the witnesses, and made succinct and persuasive arguments to the trial court. When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. (*People v. Pope* (1979) 23 Cal.3d 412, 426.) Here, we need not determine if defense counsel's actions fell below an objective standard of reasonableness because defendant cannot demonstrate that counsel's alleged deficient representation prejudiced him, i.e., there is a reasonable probability that, but for counsel's purported failings, defendant would have received a more favorable result. (*People v. Dennis*, *supra*, 17 Cal.4th at pp. 540-541; *Strickland v. Washington*, *supra*, 466 U.S. at p. 687.) Defendant, in support of his argument that he was prejudiced, simply states that he was prejudiced because the trial resulted "in a guilty verdict." This is insufficient. In fact, as discussed in detail above, the evidence against defendant was overwhelming and corroborated by the victim, the testimony of defendant's two neighbors, and the evidence found at the crime scene. After reviewing the evidence and defendant's argument, we cannot say any of the purported actions by counsel would have changed the outcome of this case. There was no prejudice.

As for appellate counsel, defendant essentially argues that counsel provided IAC for filing a *Wende* brief instead of presenting legal and sufficiency of the evidence issues on appeal. Defendant's argument is without merit because under the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have to independently review the record for potential error. Simply filing a *Wende* brief does not deem a counsel's performance as ineffective.

As to his prosecutorial misconduct argument, it appears that defendant claims misconduct based on his belief that the prosecution manipulated the testimony of the victim and witnesses "to avoid eliciting any exculpatory information[.]" Defendant claims that the mental health issues of both defendant and the victim should have been brought forth during the trial. For example, defendant states: "In this case, the jury was incapacitated from performing that function by the prosecutor's failure to inform them of the evidence of victim's prior mental health issues, her use of prescription drug addiction [*sic*], victim's drug use immediately prior and after the said incident, as well as her lifelong history of drug and alcohol abuse." Moreover, defendant argues prosecutorial misconduct because counsel allegedly failed to "comply with constitutionally mandated discovery." In support, defendant seems to be arguing misconduct because the court noted that "'we either have a victim who is lying to you or a victim who has very poor memory skills.'" Defendant goes on to state that "[w]hen the prosecution fails to correct testimony of a prosecution witness that it knows or should know is false and misleading, reversal is required if there is any reasonable likelihood the false testimony could have affected the judgment of the jury. [Citation.]"

20

"Generally, a claim of prosecutorial misconduct is not reviewable on appeal unless the defendant makes a timely objection and asks the trial court to admonish the jury to disregard the prosecutor's improper remarks. [Citation.] In the absence of an objection, 'the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citation.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 176.) In light of defendant's IAC claim, however, we hereby address defendant's claim of prosecutorial misconduct.

"'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." [Citations.]' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 960.) Here, defendant has failed to demonstrate how the prosecutor's alleged misconduct violated his right to fair trial. The prosecutor had the right to examine the victim—there was no evidence that the victim was lying under oath. Moreover, defendant had an opportunity to cross-examine the victim and question her veracity. As to the discovery, the prosecutor informed the court that she did not have any knowledge about the belt recording until the deputy mentioned it in court. The trial court—the trier of fact—believed the prosecutor. No prosecutorial misconduct is demonstrated.

Defendant further claims prosecutorial misconduct because "[t]he prosecutor unlawfully and unconstitutionally stated her personal opinion over, (12), a dozen times in her closing argument and rebuttal and these remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process and a fair trial." Defendant went on to quote another part of the prosecutor's closing statement wherein she stated: "'So in this case I think clearly the defendant owned, possessed or had under his custody and control ammunition in all three instances. Okay?'"

Defendant then claims that the trial court admonished the prosecutor by stating: "I've noticed a couple of times, [prosecutor], you've stated what your personal beliefs are, and that's improper." Defendant, however, takes this sentence out of context. Contrary to defendant's argument, the trial court stated: "Intent is something that is deduced from physical evidence, actions, statements. We don't have a way to empirically find or judge intent. As long as [prosecutor] is drawing her conclusions based on the testimony and evidence in this case, then I think that's something that she's free to do. If she's drawing her conclusion based on things that are outside of the evidence— [¶] I've noticed a couple of times, [prosecutor], you've stated what your personal beliefs are, and that's improper. [¶] But to say that based on the evidence in this case I think or I believe or I believe the evidence shows, I think that's totally permissible. And she hasn't gone beyond what the evidence has shown. Certainly you're free to argue different conclusions based on the same evidence."

We agree with the trial court that the prosecutor did not commit misconduct in her closing argument. As pointed out above by the trial court, this was a reasonable

22

inference to draw from the evidence presented during trial—which is acceptable to argue during closing argument.

Defendant also contends that there was "improper application of 'second striker' enhancement." In support, defendant contends that his 2003 conviction under section 245, subdivision (a)(1) does not qualify as a strike. Defendant, however, admitted that on December 5, 2003, he suffered a felony conviction for assault with a deadly weapon, as alleged in the information. The information alleged that this prior conviction is a serious or violent felony under the Three Strikes law. Defendant cannot now on appeal claim that his prior conviction does not qualify as a strike.

Lastly, defendant argues that he was never read his rights under *Miranda v. Arizona*, *supra*, 384 U.S. 436. Hence, his "incriminating statements were obtained in violation of *Miranda* and their admission at [defendant's] trial violated his clearly established rights under the Fifth and Fourteenth Amendments." The trial court addressed this issue. When defense counsel asked that the court exclude statements made by defendant during his interview, the court stated: "Okay. The uncontradicted evidence in this hearing is that *Miranda* warnings were read. Certainly there were questions asked by defense that suggested that they weren't. But those were questions, and the answer to those questions was that the rights were read. So with the state of the evidence that's before me, the motion is denied. I believe that the People have carried their burden of proof. And I will allow statements to come in." We agree with the trial court's assessment of this issue.

23

We have examined the entire record and are satisfied that no arguable issues exist, and that defendant has, by virtue of appellate counsel's compliance with the *Wende* procedure and our review of the record, received adequate and effective appellate review of the judgment entered against him in this case. (*People v. Kelly*, *supra*, 40 Cal.4th 106.)

## IV

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
_____
J.

We concur:


HOLLENHORST_____
Acting P. J.


CODRINGTON_____
J.